UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

                    Plaintiff,

          v.

ERIC JONES,

                    Defendant.

Case No. 23-CR-000154

MR. JONES' SUPPLEMENTAL BRIEF
IN SUPPORT OF HIS MOTION TO SUPPRESS

On the evening of March 14, 2023, Mr. Jones was calmly walking down the street while on the phone when four uniformed officers came upon him, shouted at him about the price of his coat, chased him into a nearby apartment building, pointed a gun at him, and repeatedly searched him. Mr. Jones' rights were continually violated during that encounter, from the officer's initial seizure of Mr. Jones on the apartment stairs without reasonable suspicion, through when Officer Wilson searched Mr. Jones a second time on the landing of the apartment stairs without either reasonable suspicion or probable cause. Because of these repeated violations, there are several different ways for the Court to resolve this motion in Mr. Jones' favor and suppress the gun Officer Wilson eventually found.

FACTUAL BACKGROUND

On the evening of March 14, 2023, just before 6 PM, four armed, uniformed police officers were in a squad car patrolling the 1400 block of Quincy Street NW. *See* Transcript of Motion Hearing on Feb. 8, 2024 (hereinafter "Feb. 8 Hrg. Tr.") at 18-20; Govt. Ex. 10 at 0:01. The officers were not responding to a dispatch call or serving a warrant, Feb. 8. Hrg. Tr. 46:11-22, and,

according to DC Metropolitan police crime statistics, the area surrounding the 1400 block of Quincy Street Northwest has below average gun crime.  *See* Def. Exs. 13 & 14.

The officers observed Mr. Eric Jones walking westbound on Quincy Street NW, wearing a coat with a fuzzy hood.  Feb. 8 Hrg. Tr. at 47:11–13; 48:15–19.  Mr. Jones was speaking on his cell phone, and holding his phone up to his ear as he walked.  *Id.* at 48:22–25.

The officers stopped the vehicle and the two officers on the driver's side of the car rolled down their windows to make contact with Mr. Jones.  *Id.* at 48:6–7; *see also* Govt. Ex. 10 at 0:05. Officer Joshua Wilson, from the passenger seat of the rear driver's side, called out to Mr. Jones unprompted to ask how much his winter coat cost.  *See* Feb. 8 Hrg. Tr. at 49:3–4.  Mr. Jones, still holding his cell phone to his ear, stopped to respond to Officer Wilson.  Govt. Ex. 10 at 0:06–08. He turned to face the officers and pointed at his jacket—presumably in response to Officer Wilson's question about how much the jacket cost.  *Id.*; *see also* Feb. 8 Hrg. Tr. at 49:10-13.  Mr. Jones was not angling or blading his body away from the officers as he responded.  Feb. 8 Hrg. Tr. at 49:18–20.  Instead, Mr. Jones took several steps towards the officers to cooperate with Officer Wilson.  *Id.* at 49:15–17.  Mr. Jones graciously answered Officer Wilson's rather rude question. *Id.* at 30:8; 49:21–50:1.

While Mr. Jones was briefly speaking with the officers, Officer Wilson reported observing a "large bulge" in Mr. Jones' front jacket pocket, though the bulge is not visible on the body-worn camera ("BWC") footage at this point in the interaction.  *Id.* at 30:8–10; see also Govt. Ex. 10 at 0:00–0:12.  The bulge was not in the shape of an L, nor did it have any visible corners.  Feb. 8 Hrg. Tr. at 65:16–21; *see also* Def. Ex. 6.

After stopping and politely responding to Officer Wilson, Mr. Jones turned back westbound and continued on his way.  Feb. 8 Hrg. Tr. at 50:7–9.  As Mr. Jones was walking away, the four

officers all exited their vehicle. *Id.* at 50:10–12. Mr. Jones began to move away more quickly once the officers got out of the vehicle. *Id.* at 50:20–23. The officers ran after Mr. Jones and pursued him into an apartment building on Quincy Street. *Id.* at 50:23–25. Officer Wilson chased after him and commanded him to stop. *Id.* 51:5–8. Mr. Jones stopped partway up a flight of stairs, with his hands open and raised in surrender, as Officer Wilson approached with his firearm drawn. *Id.* at 51:9–11; 15–16; 54:13–15; *see also* Def. Ex. 1. Officer Wilson could see that Mr. Jones did not have a firearm in his hands. Feb. 8 Hrg. Tr. at 54:16–18. At this point, Officer Wilson decided to holster his weapon and begin recording on his BWC. Govt. Ex. 10 at 0:40–43.

Officer Wilson approached Mr. Jones on the stairs. Feb. 8 Hrg. Tr. at 56:16–18. He immediately reached for both the right and left front pockets on Mr. Jones' jacket, squeezing the pockets. *Id.* at 56:19–57:2; *see also* Def. Ex. 2. Officer Wilson wrapped both of his hands around the pockets of Mr. Jones' coat, lifted the ends of the jacket towards himself, and squeezed the pockets to feel their contents. Feb. 8 Hrg. Tr. at 57:25–58:5, 58:16–22. At this point, Officer Wilson did not feel a firearm in Mr. Jones' coat pocket, but instead a rounded object consistent with the shape of a Gatorade bottle. *Id.* at 58:14–15, 66:5–7; Feb 15 Hrg. Tr. 33:14-18, 34:3-4. Officer Wilson also reached for Mr. Jones' cell phone. Feb. 8 Hrg. Tr.at 58:23–24. Officer Wilson then stopped his search of Mr. Jones. *Id.* at 59:4–9; *see also* Govt. Ex. 10 at 0:46–48. He directed Mr. Jones to walk to the landing at the top of the stairs, and Mr. Jones complied. Feb. 8 Hrg. Tr. at 59:14–18.

Once at the top of the stairs, Officer Wilson searched Mr. Jones again, starting with squeezing the jacket pockets he had already checked on the stairwell. *Id.* at 59:19–25. He did not see a bulge beneath Mr. Jones' coat at this, or any, point, nor did he feel a weapon. *Id.* at 60:6-14; 61:15-17. Nevertheless, Officer Wilson reached underneath Mr. Jones' jacket to feel his waist and

groin area.  *Id.* at 60:3–11.  Only at this point, while Officer Wilson was reaching underneath Mr. Jones' jacket, did Officer Wilson reportedly feel a firearm on Mr. Jones' person.  *Id.* at 60:12–14. Officer Wilson and his partner then placed Mr. Jones' hands behind his back, put him in handcuffs, and escorted him outside the building.  *Id.* at 60:20–61:4.

Once outside, Officer Wilson searched Mr. Jones for a third time.  On the public street, while Mr. Jones' hands were cuffed behind his back, Officer Wilson proceeded to undress Mr. Jones.  *Id.* at 63:20–25.  Officer Wilson lifted up Mr. Jones' jacket, undid his belt, undid his pants, reached inside the pants, pulled down yet another layer of clothing, and finally recovered what appeared to be a firearm.  *Id.* at 63:14–64:10.  The officers also recovered a Gatorade bottle from Mr. Jones' jacket pocket.  *Id.* at 65:25–66:2.  The officers then formally arrested Mr. Jones for being a felon in possession of a firearm.

## PROCEDURAL HISTORY

On May 9, 2023, Mr.  Jones was indicted on one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  Dkt. No. 1.  On September 12, 2023, Mr. Jones filed a motion to suppress the firearm and other evidence recovered by Officer Wilson and his colleagues.  Dkt. No. 18.  On September 28, 2023, the Government opposed the motion to suppress, Dkt. No. 20, and Mr. Jones filed a reply on October 13, 2023.  Dkt. No. 22.  The Court held evidentiary hearings for the motion to suppress on February 8, 2024, and February 15, 2024. The Government provided supplemental briefing at the Court's request, filed on February 14, 2024.  Dkt. No. 40.  At the conclusion of the February 15, 2024 evidentiary hearing, the Court granted the parties' request to file supplemental briefing.  Mr. Jones now files this timely brief in further support of the motion to suppress.

## LEGAL STANDARDS

"Under the Fourth Amendment, our society does not allow police officers to 'round up the usual suspects.'" *United States v. Castle*, 825 F.3d. 625, 629 (D.C. Cir 2016) (quoting *United States v. Laughrin*, 438 F.3d 1245, 1247 (10th Cir. 2006)).  Instead, police officers must have a reasonable, articulable suspicion that criminal activity is afoot before they may seize a person.  *Terry v. Ohio*, 392 U.S. 1, 21 (1968). That suspicion must go beyond an "inchoate and unparticularized suspicion, or 'hunch,'" *id.* at 27, and requires that the officer has a "particularized and objective basis for suspecting the particular person stopped of criminal activity*."  United States v. Cortez*, 449 U.S. 411, 417–18 (1981) (citations omitted).  Proving reasonable suspicion is the government's burden.  *Castle*, 825 F.3d. at 634.

Even if a stop is properly justified, the police officer must have "reason to believe, based on specific and articulable facts, . . . that he is dealing with an armed and dangerous individual" in order to conduct a protective search of a suspect.  *See United States v. Spinner*, 475 F.3d 356, 358 (D.C. Cir. 2007) (cleaned up).  That protective search or "frisk" must be "limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." *Terry,* 392 U.S. at 21; *see also Minnesota v. Dickerson*, 508 U.S. 366 (1993); *United States v. Askew*, 529 F.3d 1119, 1129 (D.C. Cir. 2008) (en banc) (plurality).

"Where evidence is obtained . . . from a search or seizure that violates the Fourth Amendment, the exclusionary rule bars such evidence from trial." *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963).

## ARGUMENT

Mr. Jones' motion should be granted for four reasons.  First, at the time Officer Wilson initially stopped Mr. Jones on the stairs inside 1416 Quincy Street NW, he lacked reasonable

suspicion to stop him.  Contrary to the government's assertion, the area was not high crime, Mr.
Jones did not display signs of nervousness, the purported bulge in his pocket was not consistent
with a firearm, and Mr. Jones' decision to end his interaction with the officers and enter 1416
Quincy Street NW does not itself establish reasonable suspicion to stop him.

Second, for similar reasons, the initial search of Mr. Jones was not supported by
reasonable suspicion that he was armed and dangerous.  If anything, suspicion was diminished
at this point because the bulge, seen closer up, was even more obviously not a firearm, and Mr.
Jones had voluntarily stopped his flight.  That search also exceeded the scope of a lawful Terry
pat-down because Officer Wilson squeezed and manipulated Mr. Jones' jacket during that first
search.

Third, Officer Wilson's second search of Mr. Jones was not supported by reasonable
suspicion either.  To the extent there was ever reasonable suspicion that Mr. Jones was armed
and dangerous, it was dispelled by that first search coming up empty.  Officer Wilson had
already squeezed and manipulated the pocket with the purported bulge during the first search
and lost any suspicion he might have had that it contained a firearm.

Finally, the second search exceeded the bounds of a permissible *Terry* pat-down because
Officer Wilson again manipulated Mr. Jones' jacket and, this time, went beneath the outer layer
of Mr. Jones' clothing prior to feeling anything suspicious.

I.      **Officer Wilson lacked reasonable suspicion to stop Mr. Jones.**

Mr. Jones was seized, at the latest, when Officer Wilson told him to stop and Mr. Jones did
so on the stairs.  *See, e.g.*, *United States v. Wood*, 981 F.2d 536, 540 (D.C. Cir. 1992) (the officer
made a show of authority when he told the defendant to "stop," and the defendant submitted to
that authority and was, thus, seized when he stood in place).  That seizure continued when Officer

Wilson touched Mr. Jones in order to search him.  *See Castle*, 825 F.3d at 633 (concluding that the individual was seized when the officer "touched" him on his arm, "instructed him to 'hold on,'" and the individual complied); *United States v. Johnson*, 365 F. Supp. 3d 89, 98 (D.D.C. 2019) (seizure began no later than the "moment of first physical contact").

Officer Wilson needed reasonable, particularized suspicion of criminal activity to stop Mr. Jones.  At the suppression hearing, Officer Wilson testified that the following factors supported his stop of Mr. Jones on suspicion of possessing a firearm:  that Mr. Jones was purportedly in a high crime area, that Officer Wilson purportedly saw a bulge, that Mr. Jones behaved nervously, and that Mr. Jones fled.  These factors—when considered separately and together—do not add up to reasonable suspicion.  Many of them are wrong as a matter of fact, and what is left is not enough.

**High crime area.**  The idea of a "high" crime area is a relative concept.  Baked into it is the idea that some areas are high crime while others are of medium or average crime and still others are low crime.  Presence in a high crime area does not justify a seizure of a suspect, though it can be a plus factor in the reasonable suspicion calculus.  *See United States v. Edmonds*, 240 F.3d 55, 60 (D.C. Cir. 2001); *Castle*, 825 F.3d at 636.  No case law supports the idea that a suspect's presence in a low or average crime area adds anything to reasonable suspicion.

Officer Wilson testified that crime was "higher than normal" in the area where Mr. Jones was arrested.  Feb. 8 Hrg. Tr. at 21:6.  He claimed there were "lots" of robberies and gun arrests in the area.[1]  *Id.* at 21:6–8.  Officer Wilson also testified about a single instance where he searched a residence in the 1416 Quincy Street apartment building and found guns and drugs there.  *Id.* at 22:21–25.  Finally, the government admitted several CCNs of purported gun-related incidents in

---

[1] Officer Wilson also testified that there were lots of drug arrests in the area.  Because Mr. Jones was not suspected of a drug crime, however, these are irrelevant.

the area, Gov. Exs. 2-9, though not all actually involved gun crime.  *See* Gov. Exs. 7 & 8 (officers received reports of gunshots but, after investigating checked the "no" shots fired box and said they had canvassed with "negative results").[2]

This impressionistic, anecdotal evidence cannot meet the government's burden to prove a high crime area, however, because MPD's own statistics prove the opposite.  Here, MPD statistics show that the area where Mr. Jones was stopped had *below average* gun crime.  The 1400 block of Quincy Street is in Police Service Area 404.  *See* DC.gov, Police Service Area Finder, https://octo.dc.gov/node/716562 (search for "Quincy Street NW and 14th Street NW"); *see also* Feb. 15 Hrg. Tr. at 27:20–23 (Officer Wilson testified that the 1400 block of Quincy Street is in PSA 404 or 407).  According to MPD statistics, in PSA 404 in the year prior to Mr. Jones' arrest, the number of violent crimes with a gun were far below the average.  *See* Def. Ex. 14 (24 crimes compared with an average of 37.8 crimes).  This is true across all common categories of violent gun crime provided by MPD crime cards statistics—robberies, homicides, assaults with a dangerous weapon, and sexual abuse.[3]  This remains true for the two adjacent PSAs: PSA 408 and PSA 407.  *See id.*  Similarly, in 2022 there were 22 adult weapons violations in PSA 404 compared

---

[2] Officer Wilson testified that he was aware of most of these incidents before the government showed him the CCNs, but the government did not elicit that he was aware of them at the relevant time—*i.e.*, when he searched Mr. Jones.  Feb. 8 Hrg. Tr. at 26:1-7.

[3] *See* Crime Cards DC,
https://crimecards.dc.gov/homicides:violent%20crimes:with%20a%20gun/dated::03132022:0313
2023/citywide:PSA (3 homicides below an average of 4);
https://crimecards.dc.gov/sex%20abuse:vio
lent%20crimes/with%20a%20gun/dated::03132022:03132023/citywide:PSA (no sexual assaults);
https://crimecards.dc.gov/robberies:violent%20crimes/with%20a%20gun/dated::03132022:0313
2023/citywide:PSA (12 robberies below an average of 18.9);
https://crimecards.dc.gov/assaults%20w_dangerous%20weapon:violent%20crimes/with%20a%2
0gun/dated::03132022:03132023/citywide:PSA (9 assaults with a dangerous weapon below an average of 15.5).

with 1481 arrests total. *See* Open Data DC, Adult Arrests, https://opendata.dc.gov/datasets/adult-arrests/explore (filter for arrest year "2022", arrest category "weapons violations," and arrest location PSA "404"). In other words, less than 1.5% of the adult weapons violations took place in PSA 404. The numbers are the same or lower for PSA 408 and PSA 407. *Id.* (filter for arrest year "2022", arrest category "weapons violations," arrest location PSA "408" and then "407").

Contrary to Officer Wilson's claim, gun crime was lower than normal in the area where Mr. Jones was stopped, not higher. Thus, it adds nothing to the reasonable suspicion calculus.

**Bulge.** Officer Wilson also testified that he saw a bulge in Mr. Jones' pocket before he pursued and seized him. Assuming a bulge was visible,[4] it also contributes nothing to the reasonable suspicion calculus.

A bulge supports a finding of reasonable suspicion when its shape is consistent with a firearm. *See United States v. Veney*, 444 F. Supp. 3d 56, 65 (D.D.C. 2020), *aff'd*, 45 F.4th 403 (D.C. Cir. 2022) ("[T]he observance of a bulge *that looks like a weapon* supplies reasonable suspicion that the person is engaged in criminal activity.") (emphasis added). A bulge in a pocket, however, does not justify a stop without facts sufficient to distinguish it from an innocuous object. *See United States v. Wilson*, 953 F.2d 116, 125 (4th Cir. 1991) (explaining that bulge "is not the sort of observation that has any significance" in reasonable suspicion analysis because "[a] coat pocket is a quite usual location for a bulky object" and the defendant did not try to hide it); *United States v. Mills*, 2021 WL 3828594, at *5 (E.D. Mich. Aug. 26, 2021) (explaining that the pocket was weighed down by something heavy "it as likely could have been a cell phone, a wallet, or car keys as it could have been a gun."); *United States v. Kelly*, 481 F. Supp. 3d 862, 873–75 (S.D. Iowa

---

[4] This bulge in Mr. Jones's pocket is not visible on the BWC footage until Officer Wilson stopped Mr. Jones on the stairs. The Court can thus conclude that Officer Wilson's purported observation of the bulge from the car was not credible.

2020) (observation of unspecified heavy object in defendant's front pocket, combined with prosecutor's observation that he knew the suspect from a prior case, were not enough to support reasonable suspicion); *Stanley v. Commonwealth*, 16 Va. App. 873, 876 (1993) (no reasonable suspicion where the bulge was consistent with a wallet or checkbook); *State v. Lafond*, 68 P.3d 1043, 1050 (Utah App. 2003) (finding no reasonable suspicion when no evidence that bulges in defendants pockets were "characteristic of pockets that contained weapons" as opposed to all the other many objects pockets are used to carry because "[p]ockets were made to carry things"); *People v. Hill*, 693 N.Y.S.2d 656 (1999) (noting that, in contrast to a "telltale" waistline bulge, a bulge from a pocket can be caused by all number of innocuous objects); *see also United States v. Jones*, 606 F.3d 964, 967 (8th Cir. 2010) (affirming suppression where defendant clutched front coat pocket as if it contained something heavy because the police "lacked the requisite reasonable suspicion that Jones was carrying a concealed firearm in his hoodie pocket, as opposed to some other object, or no object at all").

Below is a screenshot of Officer Wilson's body-worn camera depicting the bulge.[5]

---

[5] This image is taken from the Government's opposition brief. Officer Wilson testified that this is how the bulge appeared to him when he was seated in the car, though he observed it from further away.



The outline created by the bulge is clearly not consistent with a firearm.  The bulge is large and cylindrical, like a bottle.  It is much wider and rounder than a handgun would be.  And—notwithstanding the prominent outline created by this cylindrical, bottle-like shape—there is no outline or impression of a handgun handle.  Indeed, the shape truly cannot be a handgun.  There is no space for a handle on the left side of his pocket.  And if the right side is where the handle is, then the barrel is much too wide to be a gun.  Because the bulge is not consistent with a firearm, it cannot add anything to the suspicion that Mr. Jones was carrying a firearm.

**Suspicious behavior.**  Officer Wilson also testified that Mr. Jones was acting nervously before the officers got out of their vehicle, but Officer Wilson's actual testimony was short on specifics.  Officer Wilson twice said it was "hard to describe" how Mr. Jones was acting nervously, but offered that Mr. Jones normally would stop and talk to him but here Mr. Jones "kept backing and backing away."  Feb. 8. Hrg. Tr. at 31:4–5; Feb. 15 Hrg. Tr. at 30:8–13.  He also described Mr. Jones as "a little bit more standoffish."  Feb. 15 Hrg. Tr. at 30:13–14.

First and foremost, defendants have a right not to talk to law enforcement officers and the fact that they chose to exercise that right does not justify a stop. *See Florida v. Bostick*, 501 U.S. 429, 437 (1991) ("A refusal to cooperate, without more, does not furnish the minimal level objective justification needed for a detention or seizure."); *United States v. Montgomery*, 561 F.2d 875, 886 (D.C. Cir. 1977) ("[A] person may not be detained merely because he refuses to cooperate and goes on his way.").

In any event, Mr. Jones does not "ke[ep] backing and backing" away from Officer Wilson, refuse to speak with him, or otherwise appear nervous. Mr. Jones was on the phone at the time Wilson and his fellow officers came upon him. As the BWC footage depicts, when Officer Wilson and his fellow officer rolled down their windows, Mr. Jones turned in full to face them with his entire body pointed towards them while still on the phone. He then points at his jacket, stops walking in the direction he is walking in, and takes several steps *towards* Officer Wilson. Mr. Jones then answers Officer Wilson's question about the jacket, and, having politely answered Officer Wilson's rather rude question, resumes walking. Mr. Jones did not make furtive gestures, grab at his waist, or blade his body away from Officer Wilson. In short, a review of the BWC footage makes plain that Mr. Jones was not acting nervously.

To extent this behavior represents a departure from Officer Wilson's previous interactions with Mr. Jones, it is entirely explained by the fact Mr. Jones was on the phone and Officer Wilson's only attempt to engage with him was to shout at him about the price of his jacket. The fact that Mr. Jones did not immediately engage in an extended, cordial conversation, but instead graciously answered Officer Wilson's question before continuing along his way is not only understandable, but exactly what you would expect. A citizen's prior friendly chats with law enforcement do not work like a one-way ratchet obligating them to talk with law enforcement every other time in the

future lest they be labeled suspicious.  Because the BWC makes plain that Mr. Jones was not, in fact, behaving nervously, this factor adds nothing to the reasonable suspicion calculus.  *See*, *e.g., United States v. Owens*, No. 2:20-CR-00041-JDL, 2021 WL 2939935, at *9 (D. Me. July 13, 2021) (concluding that officer's description of suspicious differences in behavior between interactions with defendant with known criminal history were not supported by the BWC footage and so suppressing evidence).

**Flight.**  Officer Wilson also testified that Mr. Jones' behavior was suspicious because, once he and the other officers started to exit the car, Mr. Jones hurriedly entered a nearby building. According to Officer Wilson, Mr. Jones "has run and fled before when he was armed" and that this incident involved "the same actions that were taken" by Mr. Jones when Officer Wilson had "been on the scene and arrested Mr. Jones with firearms before[.]"  Feb. 8 Hrg. Tr. at 32:21–24.

On cross examination, defense counsel asked Officer Wilson about the CCNs of the only two prior firearms arrests of Mr. Jones produced in discovery.  Officer Wilson admitted, contrary to his previous testimony, that Mr. Jones did not flee during one of the arrests, and, for the other, the Gerstein said that Mr. Jones did not flee and that Officer Wilson was not even on the scene initially and so did not know how Mr. Jones reacted.  *See* Feb. 15 Hrg. Tr. at 9:2–3, *id.* at 10:12–13; 11:24–12:1.  To the extent Mr. Jones' previous behavior while armed is what matters, then Mr. Jones' flight exculpates him since it is *inconsistent* with how he has acted in the past when armed. Furthermore, as Officer Wilson testified at the hearing, the last time Mr. Jones was found to be in possession of a firearm was 2017.[6]  *See* Feb. 15 Hrg. Tr. at 8:15–20.  This arrest occurred when

---

[6] To the extent the government is relying on a more general idea that Mr. Jones has a criminal history to support its stop, that also does not meaningfully move the needle.  *See, e.g.*, *Shaw v. Jones*, No. CV 19-1343-KHV, 2023 WL 4684682, at *15 (D. Kan. July 21, 2023) (concluding that criminal history and other factors did not add up to reasonable suspicion); *United States v. Owens*, *(continued on next page)*

Mr. Jones was only 21 years old.  Five years—or 20% of Mr. Jones' young life—had passed since then.

Even assuming the government is relying on a more general idea that unprovoked flight can support reasonable suspicion, it does not apply here.  Again, as noted, a defendant has a right not to talk to law enforcement.  And, although unprovoked flight generally adds something to the reasonable suspicion calculus, *United States v. Wardlow*, 528 U.S. 119, 125 (2000), the same cannot be said for *provoked* flight.

Here, a group of four officers—armed and in uniform— targeted Mr. Jones.  Only after one or more of the officers—including Officer Wilson—jumped out of their vehicle to start after Mr. Jones did he quickly leave.  Mr. Jones' flight was, thus, "provoked" rather than "unprovoked." *Cf. Miles v. United States*, 181 A.3d 633, 643 (D.C. 2018) (defendant's flight provoked when, rather than fleeing at the sight of a cruiser passing by as in *Wardlow*, he fled following the police's decision to pull a police car in front of his path).  Accordingly, it does not support a finding of reasonable suspicion.

Furthermore, as set out in detail in Mr. Jones' earlier briefing, even provoked flight does not per se equal reasonable suspicion.  *See, e.g.*, *Daniels v. District of Columbia*, 894 F. Supp. 2d 61, 66 (D.D.C. 2012).  This is true whether or not the defendant is in a high-crime area.  *See, e.g.*, *Washington v. State*, 287 A.3d 301, 309 (Md. 2022); *Posey v. United States*, 201 A.3d 1198, 1204 (D.C. 2019); *Commonwealth v. Warren*, 475 Mass. 530, 538-40 (2016).  An individual may flee from police for all manner of legitimate reasons, including a fear of police brutality and the desire to avoid profound indignity of being subject to a *Terry* stop and search.  *See Warren*, 475 Mass. at

No. 2:20-CR-00041-JDL, 2021 WL 2939935, at *8 (D. Me. July 13, 2021) (same); *United States v. Wodesso*, No. 10-CR-10-LRR, 2010 WL 1976744, at *10 (N.D. Iowa May 13, 2010) (same).

540 (noting that many individuals may flea "to avoid the recurring indignity of being racially profiled"); *Washington*, 287 A.3d at 309 (noting that, under the totality of circumstances analysis, "a court may consider whether unprovoked flight could reasonably be perceived as a factor . . . consistent with innocence, including the circumstance that some individuals may fear interactions with police officers"); *See Miles*, 181 A.3d at 642 n.14 (collecting research about racial profiling and use of force against Black men in Washington, DC).

Because Mr. Jones' flight was provoked, it adds nothing to the reasonable suspicion calculus. And, even if this Court were to disagree, it should give that factor limited weight given the legitimate reasons Mr. Jones had to want to avoid police contact.

**Credibility.** Inconsistencies in Officer Wilson's testimony and his history of misstatements cast doubt on the credibility of his testimony during the hearing. For example, as noted, Officer Wilson testified that Mr. Jones flees from police when he possesses a firearm. But on cross examination, he had to admit that was not necessarily the case. *See* Feb. 15 Hrg. Tr. at 9:2–3 ("Q: Mr. Jones did not attempt to flee on that occasion? A: No."); *Id.* at 10:12-13(Q" You don't recall him attempting to flee on that occasion? A: No. It doesn't say anything in the Gerstein, no."); *Id.* at 11:24–12:1 ("I wasn't specifically in the vehicle where he was initially stopped [in 2016]. I was on the scene later, so I don't know what happened.").

Officer Wilson has given testimony in the past that was later contradicted upon further investigation. In an investigation into a potential failure to activate his body-worn camera in April 2023, Officer Wilson provided a written statement that he had attempted to turn the camera on during the incident. Feb. 15 Hrg. Tr. at 24:5–12. This was false. The investigating officer found that Officer Wilson, in fact, had not attempted to activate his body-worn camera. *Id*. at 25:14–

19. After the investigation, the body-worn camera violation against Officer Wilson was sustained. *Id*. at 21:17–22:3.

Taken together, the facts known to Officer Wilson at the time that Mr. Jones submitted to police authority by stopping on the stairs simply do not add up to reasonable suspicion. And Officer Wilson's credibility problems further undermine any suggestion of reasonable suspicion. Look at the picture as a whole: A young man is walking on the sidewalk, talking on the phone in an area with below-average crime. He has on a coat with a pocket with a bottle in it. Officer Wilson has had recent, pleasant interactions with Mr. Jones and he has not been found to have a firearm in years. When Officer Wilson interrupts his phone call with a rude question about the cost of his jacket, Mr. Jones politely turns to face him, steps towards him, and answers his question. He then continues on his way. Mr. Jones did not blade his body away from the officers. He did not grab at his waist. He did not make furtive gestures. Nevertheless, Wilson and his fellow officers hop out of their vehicle to descend on Mr. Jones. Only then does Mr. Jones take off—as was his right since the officers had not yet told him to stay put. These facts, considered together, do not add up to reasonable suspicion and the firearm must be suppressed. *See, e.g.*, *United States v. Brown*, 925 F.3d 1150, 1155-57 (9th Cir. 2019) (flight not enough); *Posey*, 201 A.3d at 1204 (same).

## II.     The first search exceeded the scope of a permissible *Terry* pat-down and, in any event, was not supported by reasonable suspicion.

Officer Wilson also violated Mr. Jones' Fourth Amendment rights when he first searched him on the stairs. The government claims that the first search was within the scope of a permissible *Terry* "pat-down." Not so. "[S]queezing, sliding, and otherwise manipulating objects or areas on a suspect's person falls outside the bounds of a pat-down frisk." *United States v. Ashley*, 37 F.3d 678, 680 (D.C. Cir. 1994); *see also United States v. Rodney*, 956 F.2d 295, 298 (D.C. Cir. 1992)

(affirming the denial of a motion to suppress because the police used a proper pat-down procedure of making a "a continuous *sweeping* motion over [the defendant's] outer garments") (emphasis added).  Officer Wilson is clearly seen manipulating Mr. Jones' pockets rather than patting them in the BWC, and he admitted as much on cross examination. Feb. 8 Hrg. Tr. at 57:1–57:2 ("Q: You squeezed the pocket.  A: Yes."); *Id.* at 58:2-3 (Q: You're squeezing his coat pockets.  Correct?  A: Yes.); *see also* Def. Ex. 2.  Thus, the search needed to be supported by probable cause rather than reasonable suspicion.  The government has made no attempt to argue that there was probable cause at this point in the interaction.

Plus, even assuming the search fell within the bounds of a *Terry* frisk, it was not supported by reasonable suspicion for the same reasons as the initial stop.  If anything, by this point the level of suspicion was diminished.  By then, Mr. Jones had voluntarily stopped and submitted to Officer Wilson, thereby mitigating any suspicion that might have been generated by his initial speedy exit into the apartment building.[7]  And the bulge, initially purportedly seen from a distance outside, is close up.  It is even more obvious—at this point in the interaction—that it was not consistent with a firearm but with a bottle.

### III.   The second search of Mr. Jones was not justified by reasonable suspicion and exceeded the scope of a permissible *Terry* pat-down.

Even assuming the initial stop and search of Mr. Jones was justified, the probing of his coat pockets on the stairs dispelled any purported reasonable suspicion that he was engaged in criminal activity or was armed and dangerous.  Furthermore, Officer Wilson's decision to search under Mr. Jones' outer clothing exceeded the permissible bounds of *Terry*, and the government has not even

---

[7] It, thus, does not appear that Mr. Jones stopped in response to Officer Wilson's decision to draw his gun.  The BWC reveals that, as Officer Wilson was turning the corner up the flight of stairs at second 36 of the BWC footage, Mr. Jones was already stopped.  *See* Gov. Ex. 10 at 00:34-00:40.

attempted to argue that Officer Wilson's second search fell into the scope of some other exception to the warrant requirement.

**Second search.**   "The proper inquiry [for a second frisk] is whether the frisk was reasonable on the facts known to the officer at the relevant moment."   *United States v. Howard*, 729 F.3d 655, 662 (7th Cir. 2013).   "An unproductive first pat down must be given weight" in the reasonable suspicion analysis, *State v. Carrillo*, 263 A.3d 1112, 1124 (N.J. App. Div. 2021), and an unproductive first search can dispel reasonable suspicion that a suspect is armed and dangerous. *See also id.*; *United States v. Gonzalez*, 434 F. Supp. 3d 509, 516 (S.D. Tex. 2020) (explaining that after first unsuccessful frisk the police had no reason to believe that the defendant was armed with a weapon); *Ballenger v. State*, 16 So. 3d 1022, 1025 (Fla. Dist. Ct. App. 2009) (same); *Matter of A.D.D.*, 974 S.W.2d 299, 306 (Tex. App. 1998) (same); *State v. Galbert*, 70 Wn. App. 721, 726 Wash. App. 1993) (second frisk of defendant unreasonable after first frisk turned up nothing and defendant made no gestures that indicated he was attempting to retrieve a weapon); *State v. Flowers*, 734 N.W.2d 239, 257 (Minn. 2007) (second search of car unreasonable where unsuccessful first search had dispelled concerns about officer safety); *State v. Pierce*, 77 P.3d 292, 297 (N.M. Ct. App. 2003) (explaining that, in most cases, the ability of the police to frisk people must be limited to one search).

By his own testimony, Officer Wilson had already searched on the stairs the areas of Mr. Jones' person where a firearm would be most readily accessible.   *See* Feb. 8 Hrg. Tr. at 33:2–5 ("I patted his jacket pockets to make sure he didn't have ready access to a firearm quickly. . . . [F]rom where I was standing from him he couldn't readily access a firearm").   In particular, at this point, Officer Wilson had felt the bulge in Mr. Jones' pocket and concluded it was not a gun.   *See id.* at 39:17–20. There was not sufficient suspicion to do another search.   *See Terry*, 392 U.S. at 30 (noting

that an officer's stop and frisk may continue only as long as "nothing in the initial stages of the encounter serves to dispel [the officer's] reasonable fear for his own or others' safety"); *see also United States v. Williams*, 38 F. App'x 26, 27 (D.C. Cir. 2002) ("bulge in appellant's pocket and furtive behavior by appellant to shield the pocket from view . . . gave the officer authority to conduct a limited patdown *of that pocket*") (emphasis added).  As noted, Mr. Jones was in an area of below-average gun crime.  He did not act nervously prior to the officers' decision to jump out of their vehicle.  And, while Mr. Jones did initially flee when provoked, he voluntarily stopped and complied with Officer Wilson.

The government tries to argue that the second search was merely a continuation of the first search.  But it was not.  It took place in a different location, at the top of the stairs, and Officer Wilson began by searching the same pockets again.  *See* Feb. 8 Hrg. Tr. at 59:21-25 (Q: You squeezed the front of the jacket again.  A: Yes.  Q: This is the same area you already checked on the stairs.  Is that correct?  A: Yes.").  If the second search was really a continuation of the first, Officer Wilson would have continued to search new areas rather than starting over with what he had already done.

The government relies on several cases in its sur-reply to support its argument that Officer Wilson's second search of Mr. Jones was lawful.  *See* Dkt. 40 at 5-6 & n.1.  They are all distinguishable.

- In the first, *United States v. Clipper*, 973 F.2d 944, 952 (D.C. Cir. 1992), the officer does not appear to have conducted two searches.  He did not move the defendant to a new location, nor re-search the same area of the defendant twice.  The government emphasizes that, during the pat-down, the officer felt a lump in the defendant's pocket, concluded it was not a weapon, and continued his search.  But, unlike here, that initial search was not premised on the reasonable suspicion generated by that lump (which does not appear to have made a visible bulge).  Instead, it was premised on an anonymous tip.  Moreover, *Clipper*, the D.C. Circuit has recognized, is no longer good law. *See United States v. Clipper*, 313 F.3d 605, 607 (D.C. Cir. 2002) (recognizing that the decision was abrogated).

- In *United States v. Robinson*, 615 F.3d 804 (7th Cir. 2010), the officer did conduct two searches.  But, unlike here, the officer in *Robinson* felt a hard object during the first search but "lost" it.  The Seventh Circuit held that "objectively speaking something hard might

have been harmful, and [the officer] was entitled to assure himself that his first impression [that the hard object was not a weapon] was correct." *Id.* at 808. Since Officer Wilson did not "lose" anything in the course of the first search, this case does not help the government.

- In *United States v. Howard*, 729 F.3d 655, 663 (7th Cir. 2013), the officers conducted two searches. The Seventh Circuit strongly suggested that the second search was unconstitutional because "[i]t [was] difficult for us to see any particularized suspicion that [the defendant] was armed and dangerous at that moment [of the second search.]" *Id* at 663. Nevertheless, because pursuant to a lawful vehicle search, the officers found a bloody shirt and gun and confirmed the defendant matched the description of a robbery suspect, the Circuit held that the cocaine found on the defendant during the second search would have been inevitably discovered. *Id.* The government does not rely on the inevitable discovery exception here, nor could it.

- In *United States v. Osbourne*, 326 F.3d 274 (1st Cir. 2003), the First Circuit rejected the suggestion that a police officer may frisk a defendant as many times as he or she wants as long as there is reasonable suspicion at the time of the first frisk. *Id.* at 277. Instead, the Circuit concluded that there was adequate cause to frisk the defendant twice under the specific circumstances of that case. *Id.* In *Osbourne*, the defendant was known to be an active member of the "inner circle" of a violent street gang involved in drug trafficking, firearms offenses, and violence with a rival gang. *Id.* at 275. The officer had information that the defendant "always" carried a firearm on his person, and, indeed, the officer was planning to serve a search warrant on the defendant's residence in the coming days. *Id.* Nothing remotely approaching that degree of suspicion is present here. Furthermore, in concluding the second search was lawful, the First Circuit looked to the fact that officers "needed to keep tabs on not one suspect but two." *Id.* That also, obviously, does not apply here.

For these reasons, the case law relied on by the government does not support the lawfulness of Officer Wilson's second search of Mr. Jones. The firearm, therefore, should be suppressed.

**Exceeded *Terry*.** In any event, even if the second search was a continuation of the first, it nevertheless exceeded the permissible bounds of *Terry*. *Terry* authorized the pat down of a defendant's "outer clothing." *Terry*, 392 U.S. at 29. An officer may place his or her hands "under the outer surface of [a suspect's] garments" only *after* he or she feels a weapon or drugs. *Id.* at 29.

Officer Wilson's search of Mr. Jones exceeded *Terry* in two ways. First, as with the first search, he manipulated Mr. Jones' pockets rather than patting them. Second, Officer Wilson lifted up Mr. Jones' jacket and reached beneath that outer layer of clothing to continue his search.

As the government conceded at the last hearing, unzipping a defendant's jacket exceeds the scope of *Terry*. *See* Feb. 15 Hrg. Tr. at 39:14. "[L]ike the opening of most other clothing, [unzipping a jacket] renders visible whatever lies underneath" and "such an action involves an even greater intrusion [than *Terry*] in precisely the same socially recognized expectation of privacy." *United States v. Askew*, 529 F.3d 1119, 1128 (D.C. Cir. 2008); *see also United States v. Wills*, 316 F. Supp. 3d 437, 445–46 (D.D.C. 2018) (patting down a backpack falls within the scope of *Terry*, but unzipping it exceeds *Terry*). Lifting up a suspect's pant leg "instead of performing a pat down" also exceeds *Terry*. *United States v. Aquino*, 674 F.3d 918, 925–26 (8th Cir. 2012). So does reaching inside a pocket before feeling a weapon or contraband. *See, e.g.*, *United States v. Brown*, 996 F.3d 998, 1010 (9th Cir. 2021). So does, as here, lifting up a jacket and searching beneath it. *See, e.g.*, *United States v. I.E.V.*, 705 F.3d 430, 433 (9th Cir. 2012).

Officer Wilson's actions, therefore, needed to be supported by probable cause. The government has never contended that they were, despite repeated invitations by this Court for it to do so. Nor could they. *See, e.g.*, *Wills*, 316 F. Supp. 3d at 446 (concluding that unzipping of backpack exceeded *Terry* and officers lacked probable cause to believe defendant was unlawfully carrying a firearm "until they recovered the firearm," notwithstanding the fact that the defendant ran as if he was clutching a firearm in his waist, tossed an object that made a metallic clank, and then proceeded to run unencumbered). Therefore, for this additional reason, the firearm should be suppressed.

**CONCLUSION**

For the foregoing reasons, the firearm seized from Mr. Jones and any other physical

evidence and statements should be suppressed as fruits of the poisonous tree.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DFENDER


_____/s/_____

Courtney Millian
Assistant Federal Public Defender
Appellate Division

Kathryn D'Adamo Guevara
Assistant Federal Public Defender
Trial Division
Office of the Federal Public Defender
for the District of Columbia
625 Indiana Avenue, N.W.
Washington, D.C. 20004

William K. Baxley
*Pro Bono Counsel for Defendant*
Moore & Van Allen, PLLC
100 North Tryon Street, Suite 4700
Charlotte, NC 28202-4003