**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

v.

ERIC JONES,

Defendant.

Criminal Action No. 23-cr-154 (TSC)

**OPINION AND ORDER**

Defendant Eric Jones was indicted on May 9, 2023, for unlawful possession of a firearm and ammunition by a person convicted of a crime punishable by imprisonment for a term exceeding one year. *See* Indictment, ECF No 1 at 1. Jones moved to suppress the firearm and other evidence, arguing that his seizure and search by Metropolitan Police Department ("MPD") officers violated the Fourth Amendment. *See* Mot. to Suppress, ECF No. 18 ("Motion"). As the court noted at a hearing on the Motion, this is "a close case," Tr. of Mot. Hr'g, ECF No. 41 at 44:16 ("Feb 15 Tr."), but, having closely reviewed the evidence, the briefing, and the relevant case law, the court will GRANT Jones' Motion.

## I. BACKGROUND

On March 14, 2023, several MPD officers saw Jones in the area of 14th and Quincy Streets, N.W. D.C., which Officer Joshua Wilson described as having a "higher than normal" crime rate. Tr. of Mot. Hr'g, ECF No. 38 at 19:21–25, 21:3–6, 47:6–13 ("Feb. 8 Tr."); *see also* Feb. 15 Tr. at 14:14–15:6. Officer Wilson rolled his window down and asked Jones, whom he recognized from "a lot" of prior interactions, how much his jacket cost. Feb. 8 Tr. at 29:22–30:6; Feb. 15 Tr. at 28:21–29:3. Jones, who was on the phone, answered the question, but

Officer Wilson observed that Jones was acting "like he doesn't normally act." Feb. 8 Tr. at 30:8–9, 25. Specifically, Officer Wilson testified that Jones "kept backing and backing away" from the officers, *id.* at 31:5, and was "a little bit more standoffish" than usual, Feb. 15 Tr. at 30:8–14. During the interaction, Officer Wilson "noticed a large bulge in the front of the jacket that Mr. Jones was wearing," Feb. 8 Tr. at 30:9–10, and therefore "exited the vehicle to make contact," *id.* at 31:6–7. Jones then ran into a nearby building and up the stairs, chased by the officers. *Id.* at 31:7–20. Jones eventually stopped in the middle of a flight of stairs, and Officer Wilson approached him and "patted his jacket pockets," where the bulge was, "to make sure he didn't have any ready access to a firearm quickly." *Id.* at 32:3–10, 33:1–5.

After confirming that the bulge was not a gun, but rather a Gatorade bottle, Officer Wilson "turned [Jones] around" and guided him to the landing at the top of the flight of steps. *Id.* at 39:21–22, 41:15–17, 58:11–22, 59:4–6, 65:25–66:2. Wilson testified that at that point, he "squeezed the front of the jacket again" and then "reached underneath Mr. Jones' jacket to feel his waist and groin area." *Id.* at 59:21–22, 60:3–8. Officer Wilson further testified that it was not until he "lifted" the jacket up and "reached underneath" it that he "felt a firearm" on Jones' person. *Id.* at 60:3–14. Officer Wilson "knew through previous" interactions that Jones was not allowed to carry a firearm, so the officers arrested and handcuffed Jones, led him downstairs and out of the building, and retrieved the firearm. *Id.* at 60:20–61:4, 62:7–20, 64:4–10; Feb. 15 Tr. at 36:21–37:3.

Jones moved to suppress the firearm on Fourth Amendment grounds. The court held two evidentiary hearings and ordered additional briefing. *See* Min. Entry for Proceedings, Feb. 8, 2024; Min. Entry for Proceedings, Feb. 15, 2024; Feb. 15 Tr. at 48:8–25.

## II. ANALYSIS

### A. Threshold Issues

At the outset, the evidence supporting the Government's argument that the officers had reasonable suspicion to stop Jones is thin at best. The Government contends that Jones was in a "higher than normal" crime area, was "acting nervous," fled from the officers unprovoked, and had a bulge in his jacket pocket that the officers believed may have been a firearm. Feb. 8 Tr. at 21:3–6, 30:25, 32:18–24. Typically, a suspect's presence in a high crime area, their unprovoked flight, and nervous behavior are, taken together, sufficient to create reasonable suspicion. *See Illinois v. Wardlow*, 528 U.S. 119, 124–25 (2000). Here, however, each contention is only weakly supported.

*High crime area.*

Officer Wilson testified that he reviews the crime reports for his patrol district, and within that district, the area in which he spotted Jones had a "higher than normal" crime rate. Feb. 15 Tr. 14:23–15:6. But that was Officer Wilson's impression from reviewing his district's crime reports—not from statistics or facts contextualizing the area within D.C. as a whole. *See also* Def.'s Supp. Br., ECF No. 42 at 8 ("MPD statistics show that the area where Mr. Jones was stopped had *below average* gun crime.").

*Flight.*

Officer Wilson testified that Jones fled from the officers only when, after engaging in conversation about his coat, Officer Wilson "exited the vehicle to make contact" with him. Feb. 8 Tr. at 31:6–7. Thus, Jones' flight was arguably provoked by the officers' actions towards him—not "unprovoked flight upon noticing the police." *Wardlow*, 528 U.S. at 124–25; *see United States v. Bridges*, 382 F. Supp. 3d 62, 68–69 (D.D.C. 2019) (acknowledging that there "may be a case in the future that squarely presents the question of whether flight by a person who

was put in fear by an aggressive or intimidating 'jump out'" of a police vehicle "can supply the reasonable basis for suspicion" given *Wardlow*'s "unprovoked flight" language).

*Nervous behavior.*

When asked to explain his observation that Jones was acting "nervous," Officer Wilson stated that Jones "kept backing and backing away" from the patrol car when the officers stopped to ask him the cost of his coat. Feb. 8 Tr. at 30:24–31:5. Officer Wilson later added that Jones was "a little more standoffish" than he had been in prior interactions. Feb. 15 Tr. at 30:8–14. It is hardly clear that such behavior depicts nervousness. It could just as easily show that Jones chose not to continue a conversation with the officers that day about the cost of his coat—which was his right. *See Florida v. Royer*, 460 U.S. 491, 497–98 (1983).

*Bulge.*

It is "the observance of a bulge that looks like a weapon" that "supplies reasonable suspicion." *United States v. Veney*, 444 F. Supp. 3d 56, 65 (D.D.C. 2020); *accord United States v. Bankins*, No. 19-3085, 2020 WL 13120202, at *3 (D.C. Cir. 2020) (explaining that "a large bulge consistent with a firearm in a person's jacket" is "sufficient to establish reasonable suspicion" (citation omitted)). But Officer Wilson testified that the "bulge" in Jones' jacket pocket was "round," Feb. 15 Tr. at 31:12, and weapons are generally not round, *see id.* at 33:4–7 (Officer Wilson acknowledging that he "wouldn't say that's a gun" regarding the bulge, but "it could be").

The court need not decide whether the officers had reasonable suspicion to stop Jones, however. Nor does it need to decide several other issues raised in Jones' Motion, including whether the officers had reason to believe he was armed and dangerous, exceeded the scope of a pat down by squeezing his pocket on the stairs, or were entitled to continue to pat him down on

the landing after determining the bulge in his pocket was a Gatorade bottle. That is because, even assuming the Government succeeded on each of those issues, Officer Wilson exceeded the scope of a permissible frisk by reaching under Jones' outer clothing to pat down his groin and waist area on the landing of the stairwell.

**B. Scope of a Permissible Frisk**

"When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Terry v. Ohio*, 392 U.S. 1, 24 (1968). This "protective search for weapons" must be "confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Id.* at 29. In *Terry*, the Supreme Court, in finding that an officer did not violate the Fourth Amendment, noted that he "did not place his hands in [the suspects'] pockets or under the outer surface of their garments until he had felt weapons, and then he merely reached for and removed the guns." *Id.* at 29–30.

That said, a *Terry* frisk is not always limited to patting down the outer clothing. "Any reasonably limited intrusion designed to discover guns, knives, clubs, or other instruments of assault is permissible." *United States v. Thompson*, 597 F.2d 187, 191 (9th Cir. 1979). The touchstone is always reasonableness under the circumstances. "The scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." *Terry*, 392 U.S. at 19 (citations omitted); *accord id.* at 29 ("[E]vidence may not be introduced if

it was discovered by means of a seizure and search which were not reasonably related in scope to the justification for their initiation.").

The Supreme Court has conducted this balancing several times. First, in *Adams v. Williams*, 407 U.S. 143, 147–48 (1972), it held that an officer did not violate the Fourth Amendment when he "reach[ed] to the spot where [a] gun was thought to be hidden" because an informant told him about the weapon, including where it was, and the suspect refused to step out of the vehicle when the officer asked. Given this context, the Court held that the officer's decision to reach for the weapon was "a limited intrusion designed to insure his safety." *Id.* at 149. Second, in *Sibron v. New York*, 392 U.S. 40, 65 (1968), the Court held that, even assuming the officer had reason to believe the suspect was armed and dangerous, "the nature and scope of the search conducted by [the officer] were so clearly unrelated to th[e] justification" because the officer "thrust his hand into Sibron's pocket" "with no attempt at an initial limited exploration for arms." And finally, in *Minnesota v. Dickerson*, 508 U.S. 366, 378 (1993) (citation omitted), the Court held that an "officer's continued exploration of [the suspect's] pocket after having concluded that it contained no weapon was unrelated to 'the sole justification of the search under *Terry*: the protection of the police officer and others nearby.'"

Applying this line of cases, the D.C. Circuit held that an officer violated *Terry* by unzipping a suspect's jacket during a show-up identification procedure. *See United States v. Askew*, 529 F.3d 1119, 1130–34 (D.C. Cir. 2008) (en banc). In comparing *Askew*'s facts with *Dickerson*'s, the Circuit explained that, "while the officer in *Dickerson* felt the lump through the jacket pocket, he did not physically penetrate the outer surface of the jacket" and "his actions did not reveal the contents of the pocket to the public at large," making the intrusion in *Askew* even more severe than the intrusion the Court found unconstitutional in *Dickerson*. *Id.* at 1133.

### C. Officer Wilson Exceeded the Scope of a Frisk

Upon reviewing the evidence and the legal framework, the court concludes that Officer Wilson exceeded the permissible scope of a *Terry* frisk. At the evidentiary hearing, Officer Wilson was asked "you reached underneath Mr. Jones' jacket to feel his waist and groin area. Is that correct?" He responded "Yes." Feb. 8 Tr. at 60:3–5. Officer Wilson further testified that he "lifted it up"—referring to the jacket—and that it was only once he did so that he "felt a firearm." *Id.* at 60:6–14. By placing his hands "under the outer surface of [Jones'] garments" before feeling a weapon, Officer Wilson's actions contravened the plain letter of *Terry*, 329 U.S. at 29–30. Nor was his search "reasonably related in scope to the justification for [its] initiation." *Id.* at 29. The search was not targeted to a specific area where he had reason to believe Jones was hiding a weapon, *see Adams,* 407 U.S. at 147–49, nor was it confined to simply exploring a pocket for weapons, *see Dickerson*, 508 U.S. at 378. Rather, Officer Wilson "physically penetrate[d] the outer surface of the jacket" and reached under Jones' outer clothing—a more severe intrusion not justified under the circumstances. *See Askew*, 529 F.3d at 1133.

The Government argues that out-of-Circuit cases support a blanket rule that "officers can lift a jacket to conduct a patdown," and urges the court to apply that rule here. Government Resp. to Supp. Br., ECF No. 43 at 17. In the cases the Government cites, however, courts have held only that, on a particular set of facts, an officer did not violate the Fourth Amendment by lifting up a suspect's outer clothing or asking the suspect to do so to permit a visual inspection for firearms. *See, e.g.*, *United States v. Reyes*, 349 F.3d 219, 224–25 (5th Cir. 2003); *United States v. Baker*, 78 F.3d 135, 138 (4th Cir. 1996); *United States v. Hill*, 545 F.2d 1191, 1193 (9th Cir. 1976) (per curiam). In *Reyes*, 349 F.3d at 225, the Fifth Circuit held that "the raising of a suspect's shirt by a law enforcement officer does not violate the boundaries established in

*Terry*," because the officer did not "touch the defendant" and "[n]on-consensual touching of another in most cases is clearly more intrusive of an individual's personal security than is a request to raise a shirt." *Accord Baker*, 78 F.3d at 138 ("[D]irecting that Baker raise his shirt constituted a reasonable search limited to discovering whether he was carrying a concealed weapon" and "was less intrusive than the patdown frisk sanctioned in *Terry*."). Similarly, in *Hill*, 545 F.2d at 1193, the Ninth Circuit held that an officer lifting a suspect's shirt "was not, under the circumstances, overly intrusive" because it "was wholly confined to the area of [a visible] bulge . . . and was a direct and specific inquiry." Each court balanced the officers' need to ensure their immediate safety against the extent of the intrusion, as the Fourth Amendment always requires, rather than applying a bright-line rule.

As the court has explained, this balance comes out the other way in this case, where the officer reached under Jones' clothes and touched his waist and groin area to feel for firearms, especially given that the bulge causing the officer's initial suspicion had already been revealed to be a Gatorade bottle. In fact, *Reyes*, *Baker*, and *Hill* all provide examples of more "limited intrusion[s]" that Officer Wilson chose to bypass in this case. Across a variety of circumstances, courts have emphasized that reaching and touching a suspect beneath their outer clothing is a more severe intrusion than *Terry* allows. *See, e.g.*, *Terry*, 329 U.S. at 29–30; *Askew*, 529 F.3d at 1133; *Reyes*, 349 F.3d at 225. That intrusion was not warranted in this case.

**D. Exclusionary Rule**

The exclusionary rule requires a court to grant a motion to suppress if a party seeks to introduce evidence that was obtained in violation of the Fourth Amendment. *Wong Sun v. United States*, 371 U.S. 471, 485 (1963). This rule applies not only to evidence obtained "during" the unlawful invasion, but also evidence obtained "as a direct result of" it. *Id.* Such

evidence is known as "fruit of the poisonous tree." *Utah v. Strieff*, 579 U.S. 232, 237 (2016). The court will therefore suppress the firearm, which was recovered during and only because of the illegal search.[1]

## III. CONCLUSION

For the foregoing reasons, Jones' Motion to Suppress, ECF No. 18, is hereby GRANTED.

Date: May 17, 2024

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge

[1] Jones also asks the court to suppress "any other physical evidence and statements," but does not specify which physical evidence or statements he refers to or argue why that evidence is fruit of the poisonous tree. Motion at 8. Consequently, if the parties move forward in this case, the court will consider whether to suppress any specific physical evidence or statements that the defense "make[s] a prima facie showing" contain "a causal nexus" to the Fourth Amendment violation. *United States v. Holmes*, 505 F.3d 1288, 1292 (D.C. Cir. 2007).